**Leonard SPORN, et al., Plaintiffs,**

v.

**OCEAN COLONY CONDOMINIUM ASSOCIATION, et al.,
Defendants.**

No. 00–1179 (JEI).

United States District Court,
D. New Jersey.

Oct. 29, 2001.

## OPINION

IRENAS, District Judge.

Presently before the Court is the Motion for Summary Judgment of Defendants Ocean Colony Condominium Association, Carol Ramchandani, Charles Haines, Betsy Beaver, Fred Shoyer and Frank Pisaturo. For the reasons set forth below, Defendants' motion is granted.

### I.

Plaintiffs Leonard Sporn ("Mr.Sporn"), Dolores Sporn ("Mrs.Sporn"), Amelia Thomas ("A.Thomas") and Rosemarie Thomas ("R.Thomas") were unit owners at the Ocean Colony Condominium in Ocean City, New Jersey. The dispute out of which this action arose began in January 1998 when Defendant Ocean Colony Condominium Association ("the Association"), through its Board of Trustees, a number of whom are named as defendants in this case, issued a regulation in which an "Adult Lounge", inaccessible to children, was created at Ocean Colony. (Compl.¶ 15). In response to this regulation, Plaintiffs filed, in January 1999, a petition with the United States Department of Housing and Urban Development ("HUD") seeking a ruling on whether the exclusion of children from the adult lounge violated the provisions of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.* According to Plaintiffs, Defendants allegedly responded to this complaint by engaging in "a campaign to discredit the plaintiffs with other unit owners" and "shunning" and "ostracizing" Plaintiffs. (Compl. at ¶ 17).

In March 2000, Plaintiffs filed the instant action against the Association and several individual members of the Board of Trustees, alleging that the creation of the adult lounge violated the FHA and that Defendants' "retaliatory" actions constitut-

Taylor, Boguski & Greenberg, by Robert Aaron Greenberg, Larchmont Law & Professional Center, Mount Laurel, NJ, for Plaintiffs.

Stark & Stark by David J. Byrne, Princeton, NJ, for Defendants.

ed unlawful interference with the exercise and enjoyment of Plaintiffs' FHA rights. (Compl.¶¶ 28, 31).

In addition, Plaintiffs assert a number of claims related to the Defendants' treatment of Leonard Sporn. Mr. Sporn suffers from severe spinal stenosis and is confined to a wheelchair. Plaintiffs assert that Defendants failed, in a number of ways, to comply with their obligations under the FHA and New Jersey law to "reasonably accommodate" Mr. Sporn's handicap. Specifically, Plaintiffs claim that Defendants refused to honor Mr. Sporn's request that he be provided with a handicapped parking space adjacent to a wheelchair-accessible entrance to the Condominium, and failed, in connection with renovations to the Condominium made in 1999, to provide handicapped access to the building and to the common area restrooms. (Compl.¶¶ 22–26).

Plaintiffs' final claim is that the actions of the Defendants constitute intentional and negligent infliction of emotional distress.

This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1331, 1367.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

## III.

### A.

The Fair Housing Act, 42 U.S.C. § 3601, *et seq.,* passed as Title VIII of the Civil Rights Act of 1968 and amended by the Fair Housing Amendments Act (FHAA) of 1988 to protect handicapped persons, provides that it is unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services in connection with such a dwelling, because of the handicap of that person. . . ." 42 U.S.C. § 3604(f)(2). The relevant provisions of the FHA's definition of "discrimination" make unlawful:

> (B) A refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling; [and]

> (C) in connection with the design and construction of covered multifamily dwellings for first occupancy after the date that is 30 months after September 13, 1988, a failure to design and construct those dwellings in such a manner that the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons [and] all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs.

42 U.S.C. §§ 3604(f)(3)(B), (C). Although Plaintiffs fail to cite to any specific provisions FHA in their complaint and cite to inapplicable provisions of the Act in the single paragraph discussing the issue in their response to the instant motion, it appears from their references to the denial of a "lawful accommodation" and their use of language identical to that in § 3604(f)(3)(C) that their claims are properly regarded as brought under the sections cited above.

■ The evidence offered by Plaintiffs relating to the inadequacy of Defendants' renovations under 3604(f)(3)(C) is wholly insufficient to survive a motion for summary judgment. Even assuming that the subsection's requirements relating to the design and construction of "covered multi-family dwellings for first occupancy" apply to renovations such as those alleged here (a proposition for which Plaintiffs cite no legal authority), Plaintiffs have not offered a single shred of evidence relating to the nature of renovations undertaken, the condition of the facilities at issue prior to the renovations or the alleged inadequacies of the Condominium after the renovations. As the Supreme Court has noted, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citation omitted). Here, Plaintiffs have failed entirely to meet this requirement.[1]

■ Plaintiffs claim of denial of reasonable accommodations under § 3604(f)(3)(B) is similarly without merit. While it is true that the FHA's reasonable accommodation requirement "can and often will" involve the imposition of some costs upon a landlord, *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 334–335 (2d Cir.1995); *see also, Assisted Living Associates of Moorestown v. Moorestown Township*, 996 F.Supp. 409, 434–435 (D.N.J.1998), accommodation is required only where such measures "may be necessary to afford such a [handi-

capped] person equal opportunity to use and enjoy a dwelling" and need only be "reasonable." 42 U.S.C. § 3604(f)(3)(B); *see also, Gavin v. Spring Ridge Conservancy, Inc.*, 934 F.Supp. 685, 687 (D.Md. 1995) (emphasizing that FHA does not require accommodation wherever convenient or desired, but only where necessary). Given the dearth of evidence offered by Plaintiffs relating to necessity of Leonard Sporn's requested accommodations and the rather extensive evidence offered by the Defendants relating to the reasonableness of their efforts to accommodate Mr. Sporn, Plaintiffs claim cannot survive the instant motion.

As mentioned, Plaintiffs have offered no evidence whatsoever regarding the 1999 renovations to the Condominium or Plaintiff's claims relating thereto. Therefore, those claims cannot stand, regardless of the theory offered to support them. Accordingly, the only remaining issue in this area relates to Mr. Sporn's claim of entitlement to a handicapped parking space.

■ It has been recognized on numerous occasions that the FHA may, in certain cases, entitle a handicapped tenant to a reserved parking space adjacent to the tenant's dwelling. *See, e.g., Jankowski Lee & Associates v. Cisneros*, 91 F.3d 891, 895–896 (7th Cir.1996); *Shapiro*, 51 F.3d at 335; *Hubbard v. Samson Management Corporation*, 994 F.Supp. 187, 192 (S.D.N.Y.1998); *Trovato v. City of Manchester*, 992 F.Supp. 493, 498 (D.N.H. 1997); *see also,* 24 C.F.R. § 100.204, Example (2) (2001). Although Plaintiffs have not offered any evidence of the spe-

---

1. It should be further noted that there are some vague allusions in Plaintiffs' papers to the requirements of § 3604(f)(3)(A), which require that a landlord permit a tenant to modify the existing premises so as to make them handicapped accessible where such modifications would help the handicapped tenant attain "full enjoyment" of the premises. However, such modifications need only be permitted "at the expense of the handicapped person" and, as Defendants point out, there is no evidence that Plaintiffs ever offered to pay for the modifications to the restrooms and the facility entrance.

cific nature of Mr. Sporn's handicap, or of the inadequacy of the parking arrangements that pre-existed his request for accommodation, Defendants do not appear to challenge the necessity of Plaintiff's accommodation, but instead focus on the reasonableness of the accommodations they attempted to provide. (See Def. Br. at 26).

■ "The reasonable accommodation inquiry is highly fact-specific, requiring a case-by-case determination." *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1104 (3d cir.1996) (quoting *United States v. California Mobile Home Park Management Co.*, 29 F.3d 1413, 1418 (9th Cir. 1994)). Here, while Plaintiffs have provided no evidence relating to Mr. Sporn's request for a handicapped parking space, Defendants have demonstrated that they did, in fact, take significant steps to provide Mr. Sporn with an acceptable accommodation and never "refused" to permit such accommodations.

■ The FHA entitles a handicapped individual to "equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3). Accordingly, "an accommodation should not 'extend a preference to handicapped residents [relative to other residents], as opposed to affording them equal opportunity' " and "accommodations that go beyond affording a handicapped tenant 'an equal opportunity to use and enjoy a dwelling' are not required by the Act." *Hubbard*, 994 F.Supp. at 190 (citing *United States v. California Mobile Home Park*, 29 F.3d 1413, 1418 (9th Cir.1994) and *Bryant Woods Inn, Inc. v. Howard Cty.* 124 F.3d 597, 605 (4th Cir.1997)). In this case, in response to Leonard Sporn's requests for a handicapped parking, the Association adopted a "Handicapped Parking Policy" in December 1999. (Beaver Cert. ¶ 25). This policy provided that "handicapped parking spaces [defined as spaces closer to the Condominium entrance] shall be provided to residents" provided that any resident seeking such a space "trade in their deeded parking space for an Association owned space closer to the building entrance." (*Id.*, Ex. D) On its face, this policy grants the same rights to handicapped tenants as it does non-handicapped residents. In order to prevail on his discrimination claim, therefore, Mr. Sporn must demonstrate that the Association's actions toward him individually constituted a refusal to reasonably accommodate his handicap. This he cannot do. According to his own testimony, the problems that arose between the Association and Mr. Sporn began when Sporn demanded that he be provided a handicapped space (a proposal to which Defendants agreed) but refused to give up his non-handicapped, deeded space as required by the Handicapped Parking Policy. (L. Sporn Dep. at 58–59). When asked why he needed two spaces, Sporn did not offer any explanation related to his handicap, but instead responded, "because during the summertime we couldn't get any parking for any of our family that came down." (*Id.*). These comments reveal that Sporn's request for "reasonable accommodation" was really a request for accommodation coupled with a demand for special treatment. Thus, Sporn's refusal to accept the Association's proposed accommodation cannot provide the basis for an FHA discrimination claim. As the Seventh Circuit noted in *Jankowski*, the FHA only creates a right to a "reasonable accommodation," it "does not create a right to an assigned handicapped space." 91 F.3d at 896. Accordingly, the Court determines that the actions of the Association in negotiating with Mr. Sporn and his attorneys about the creation of a handicapped space (see Beaver Cert. at ¶¶ 11–24), promulgating non-discriminatory handicapped parking regulations and

offering a handicapped space to Mr. Sporn several times even after he had rejected the Association's proposal (see letters of Steven Scherzer to Carl Bowman, Beaver Cert., Ex. F) constitute a "reasonable accommodation" within the meaning of § 3604 of the Fair Housing Act and that Defendants' Motion for Summary Judgment as to the claims contained in Count III of Plaintiffs' Complaint should therefore be granted.

**B.**

The primary contention involved in Plaintiffs' claim of unlawful interference with FHA rights appears to be that Defendants' actions in "shunning" them, allegedly in retaliation for Plaintiffs' filing of their HUD complaint, constituted a violation of the FHA, 42 U.S.C. § 3617. Section 3617 provides that:

It shall be unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encourage any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605 or 3606 of this title.

42 U.S.C. § 3617.

■ As one district court has noted, a plaintiff's "subjective beliefs of intentional discrimination and retaliation" are "of course insufficient to show an intentional discriminatory animus." *Gavin*, 934 F.Supp. at 687. In their brief, Plaintiffs point to the deposition testimony of a number of unit owners (including Plaintiffs) and to statements made by Board member Carol Ramchandani as evidence of the retaliatory actions taken by Defendants. This evidence, even when viewed in the light most favorable to Plaintiffs, amounts to nothing more than repeated statements of Plaintiffs' subjective beliefs of discrimination and is therefore insufficient to survive summary judgment.[2]

Even if there were sufficient evidence to support an inference that Plaintiffs were "shunned" in response to their HUD complaints, such actions simply do not constitute "coercion, intimidation, threats or interference" within the meaning of § 3617. The Fair Housing Act is remedial legislation designed to address the very important goal of providing accessibility to housing without regard to race, color, religion, sex, familial status, national origin or disability. *See generally*, 42 U.S.C. §§ 3601, 3604. Consistent with this goal, the prohibitions of § 3617 operate to ensure that situations that need to remedied can be brought to the attention of those with the power to effectuate the necessary changes. Section 3617 does not, however, purport to impose a code of civility on those dealing with individuals who have exercised their FHA rights. Simply put, § 3617 does not require that neighbors smile, say hello or hold the door for each other. To hold otherwise would be to extend § 3617 to conduct it was never intended to address and would have the effect of demeaning

---

**2.** Plaintiffs rely heavily on a statement made by Carol Ramchandani to the effect that the other unit owners should "shun the people that create the disturbance." While Plaintiffs contend that this statement was targeted at Plaintiffs, the overwhelming evidence suggests that it instead referred to problems caused by another unit owner who had allegedly threatened Defendants with violence in response to the handling of the community room issue. Thus, even viewing the facts and inferences in a light most favorable to the non-moving party, *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986), the Court determines that no reasonable finder of fact could, after considering Ramchandani's statements in their proper context, draw the inferences that Plaintiffs suggest.

the aims of the Act and the legitimate claims of plaintiffs who have been subjected to invidious and hurtful discrimination and retaliation in the housing market.

■ While "the language 'interfere with' has been broadly applied to 'reach all practices which have the effect of interfering with the exercise of rights' under the federal fair housing laws", *Michigan Advocacy Serv. v. Babin,* 18 F.3d 337, 347 (6th Cir.1994), a brief look at the cases in which § 3617 violations have been found demonstrates that "shunning" is not the kind of behavior that interferes with FHA rights. *See, e.g., Fowler v. Borough of Westville,* 97 F.Supp.2d 602 (D.N.J.2000) (use of building code and police harassment to drive handicapped plaintiffs out of their special residences); *Byrd v. Brandeburg,* 922 F.Supp. 60 (N.D.Ohio 1996) (tossing of Molotov cocktail onto porch of African–American residents); *United States v. Sea Winds of Marco, Inc.,* 893 F.Supp. 1051 (M.D.Fla.1995) (requiring Hispanic tenants to wear special wrist bands and subjecting them to excessive monitoring and racially-derogatory remarks); *Johnson v. Smith,* 878 F.Supp. 1150 (N.D.Ill.1995) (cross burned in front yard of African–American family and brick thrown through their window); *People Helpers v. City of Richmond,* 789 F.Supp. 725 (E.D.Va.1992) (police "bullied" their way into and selectively searched handicapped and African–American plaintiffs' apartments). While this Court has, as Plaintiffs note, recognized that "violence or physical coercion is not a prerequisite to a claim under § 3617," *Fowler v. Borough of Westville,* 97 F.Supp.2d 602 (D.N.J.2000), the conduct complained of must nevertheless be of sufficient magnitude to permit a finding of intimidation, coercion, threats or interference. *See, e.g., Babin,* 18 F.3d at 347, 348 (holding that actions of defendants in engaging in economic competition did not "rise to the level of interference with the rights of plaintiffs" and that actions of neighbors, while interfering with plaintiff's negotiations, were not "direct enough" to state a claim for violation of § 3617). That said, the actions allegedly taken by Defendants do not, even if taken for the reasons that Plaintiffs suggest, constitute interference with any rights protected by § 3617.[3]

### C.

Plaintiffs' final FHA claim is based on the designation of part of the common area of the Condominium as an "adult lounge." Plaintiffs seek an injunction "prohibiting the defendant from prohibiting reasonable access to all person in common areas regardless of age." (Compl.¶ 51(a)). However, it is undisputed that the former Adult Lounge was made accessible to all residents by the Board on July 10, 1999, some eight months prior to the filing of the instant suit. Accordingly, there is no justiciable case or controversy on this issue and Defendants' Motion for Summary Judgment will be granted. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again."); *Anderson v. Davila,* 125 F.3d 148, 163 (3d Cir.1997) ("A party seeking injunctive re-

---

3. Plaintiffs also point to Leonard Sporn's testimony that he believed that the installation of a new front door at the Condominium was delayed because of the filing of his complaints. However, the evidence offered (which consists of a statement made to Sporn by a city inspector based on a conversation between the inspector and the contractor charged with the installation of the new door) is insufficient to permit an inference of a retaliatory motive for this alleged foot-dragging.

lief must demonstrate that there exists some cognizable danger of recurrent violation of its legal rights.") (citation omitted). Further, to the extent that Plaintiffs are seeking damages on their claim regarding the adult lounge (it is unclear whether they are doing so), their claim fails as they have not demonstrated that they suffered any injuries as a result of the Association's policy. (See A. Thomas Dep. at 24, 31–34; R. Thomas Dep. at 16, 21; L. Sporn Dep. at 15–17; D. Sporn Dep. at 20).

## IV.

Plaintiffs also assert a number of state law claims related to their dispute with the Association. Although Plaintiffs do not cite to any specific provisions of New Jersey law to support their contentions, they appear to argue that Defendants' actions violated the provisions of the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5–1, *et seq.* Since Plaintiffs in their brief focus exclusively on their Fair Housing Act claims and do not clarify the vague assertions made in their Complaint, Defendants (and the Court) are forced to speculate as to the specific claims asserted under the LAD. While Defendants point to a number of provisions of the LAD on which Plaintiffs claims could be based, Plaintiffs do not address these arguments in their response. Accordingly, the Court will assume that Defendants have correctly identified the specific LAD provisions implicated by Plaintiffs' claims.

▮ The provision of the LAD which deals specifically with the accommodation of handicapped persons in housing is N.J.S.A. 10:5–12.4, which states that "a failure to design and construct any multi-

family dwelling of four units or more in accordance with barrier free standards promulgated by the Commissioner of Community Affairs ... shall be an unlawful discrimination." As with Plaintiffs' FHA claims, there has been offered no evidence whatsoever regarding the legal obligations of Defendants to comply with 10:5–12.4 or the actions that Defendants did or did not take with regard to the 1999 renovations. Accordingly, any claims that Plaintiffs intended to assert in this area cannot survive the instant motion.

▮ Plaintiffs also contend that the filing of their HUD complaint was protected by the LAD and that Defendants' actions interfered with that protected conduct. Like the FHA, the LAD contains an anti-retaliation provision that makes it unlawful to "take reprisals against any person because that person has opposed any practices or acts forbidden under this act ... or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of ... any right granted or protected by this act." N.J.S.A. 10:5–12. Although "it is well-established that the LAD is intended to be New Jersey's remedy for unacceptable discrimination and is to be construed liberally," *Franek v. Tomahawk Lake Resort*, 333 N.J.Super. 206, 217, 754 A.2d 1237 (App.Div.2000); *see also, Cedeno v. Montclair State Univ.*, 163 N.J. 473, 478, 750 A.2d 73 (2000), the Court would simply be stretching the definition of "interference" too far if it were to hold that a lack of friendliness and civility between neighbors caused by a dispute over the use of their Condominium constitutes a violation of the LAD.[4] While there

---

4. Relevant to the Court's interpretation of this provision is that N.J.S.A. 10:5–12 was amended in 1992 to add reference to coercion, intimidation, threats and interference and that this additional language is identical to that incorporated into the Fair Housing Act. Therefore, given that New Jersey courts have often looked to federal standards in interpreting the LAD, *see, e.g., Grigoletti v. Ortho Pharmaceutical Corp.*, 118 N.J. 89, 97, 570 A.2d

are, no doubt, a variety of ways that these Defendants could have unlawfully retaliated against Plaintiffs under the LAD, mere "shunning", without more, is not one of them.

Finally, Plaintiffs assert claims for intentional and negligent infliction of emotional distress against Defendants. To state a claim for intentional infliction of emotional distress under New Jersey Law, a plaintiff must demonstrate severe emotional distress resulting from conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley v. Trenton Saving Fund Society*, 111 N.J. 355, 367, 544 A.2d 857 (citing *Restatement (Second) of Torts*, § 46). In this case, Defendants' actions in response to what they perceived as unnecessary antagonism and meritless and expensive litigation created by Plaintiffs simply cannot be said to rise to the level of outrageous conduct required before a recovery for intentional infliction of emotional distress is permitted. Thus, summary judgment on this claim is appropriate.

As to Plaintiffs' claim for negligent infliction of emotional distress, it should be noted that New Jersey recognizes two types of claims in this area. The first group of claims encompasses cases "in which a person who is the direct object of a tortfeasor's negligence experiences severe emotional trauma as a result of the tortfeasor's negligent act or omission." *Gendek v. Poblete*, 139 N.J. 291, 296, 654 A.2d 970 (1995). Second, a plaintiff may prevail on a so-called "indirect claim" for negligent infliction of emotional distress where "a person, not otherwise a direct object of a tortfeasor's negligence, experiences severe emotional distress when another person suffers serious or fatal injuries as a result of that negligence." *Id.* As there are no "serious or fatal" injuries involved in this case, Plaintiffs' claims must treated as "direct".

The analysis of direct claims of negligent infliction of emotional distress "involves traditional concepts of duty, breach and causation" and "determining defendant's negligence depends on whether defendant owed a duty of care to the plaintiff, which is analyzed in terms of foreseeability." *Williamson v. Waldman*, 150 N.J. 232, 239, 696 A.2d 14 (1997). In this case, it cannot be said that Defendants conduct breached any duty of care owed to Plaintiffs. Plaintiffs allege, in essence, that Defendants were obligated to be as friendly to Plaintiffs after the filing of the HUD complaints and the instant lawsuit as they were before. This contention simply has no basis in the law of negligence. Any duty of care that exists between neighbors simply does not extend to the niceties of day-to-day interactions. In this case, Plaintiffs and Defendants were involved in a dispute over the regulations and policies of the Association at Ocean Colony. This dispute had dragged on for a number of years and had cost each side thousands of dollars in legal fees. Given that context, it cannot be said that the Defendants's conduct in ignoring Plaintiffs or failing to say hello in the hallways gives rise to a claim for negligent infliction of emotional distress. Defendants neither owed Plaintiffs a duty of civility, nor would they, under the circumstances, be considered to have breached any such duty were one to exist. Accordingly, Plaintiff claim for negligent

903 (1990) ("The substantive and procedural standards that we have developed under the State's LAD have been markedly influenced by the federal experience."), the Court consid- ers those cases interpreting the provisions of § 3617 of the FHA discussed above instructive in determining the proper scope of the LAD's anti-retaliation provision.

infliction of emotional distress must be dismissed.

### V.

 In conjunction with their response to the instant motion, Plaintiffs filed a request that, rather than deciding the case against them on the merits, the Court permit Plaintiffs to voluntarily dismiss their case without prejudice under Rule 41 of the Federal Rules of Civil Procedure. Rule 41(a)(2) provides that once a defendant files an answer or motion for summary judgment, a plaintiff may not voluntarily dismiss its action "save upon order to the court." Generally, a motion for dismissal "should not be denied absent substantial prejudice to the defendant." *Johnston Development Group, Inc. v. Carpenters Local Union No. 1578*, 728 F.Supp. 1142, 1146 (D.N.J.1990) (Brotman, J.) (quoting *Andes v. Versant Corp.*, 788 F.2d 1033, 1036 (4th Cir.1986)); *see also*, 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2364 (2d ed.1995). In determining whether a voluntary dismissal is likely to result in prejudice to the defendant, the factors to be considered include "the expense of a second litigation, the effort and expense incurred by a defendant in preparing for trial in the current case, the extent to which the current case has progressed, and plaintiff's diligence in bringing the motion to dismiss." *Palmer v. Security National Bank*, 2001 WL 877584, at * 1 (E.D.Pa. June 13, 2001)(citing *Maleski v. DP Realty Trust*, 162 F.R.D. 496, 498 (E.D.Pa.1995)). An examination of these factors as they relate to this case leads to the conclusion that Plaintiffs' motion should be denied. This case was originally filed in March 2000 and the dispute underlying it has been going on for almost four years. In addition, the instant motion has, due in large part to the disappearance of Plaintiffs' former attorney, been pending for nearly four months. Further, signifi-

cant discovery has already been conducted, the merits of the legal issues involved are determinable and Defendants have incurred substantial expense both in defending the merits of the case and in simply attempting to keep this case moving along toward resolution. Finally, while it is indeed unfortunate that Plaintiffs appear to have gotten a raw deal from their former attorney, they have known since May 2001 that that attorney would no longer be representing them but did not retain new counsel or seek to dismiss their action until now. Accordingly, because Defendants would suffer substantial prejudice as a result of voluntary dismissal without prejudice and because the merits of the instant motion can be readily reached, Plaintiffs motion for voluntary dismissal pursuant to Fed.R.Civ.P. 41(a)(2) shall be denied.

### VI.

For the reasons set forth above, Defendants' Motion for Summary Judgment will be granted and Plaintiffs' Motion to Voluntarily Dismiss will be denied. The Court will enter an appropriate order.